## INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., et al., Appellants,
### v.
## Michael HEFFRON, Secretary and Manager of the Minnesota State Agricultural Society Board of Managers, et al., Respondents.

### No. 49526.

Supreme Court of Minnesota.

Aug. 18, 1980.

Certiorari Granted Jan. 19, 1981.
See 101 S.Ct. 917.

Barry Fisher and Robert C. Moest, Los Angeles, Cal., Dayton, Herman, Graham & Getts and James A. Payne, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Kent G. Harbison and William P. Marshall, Sp. Asst. Attys. Gen., St. Paul, for respondents.

PETERSON, Justice.

Plaintiffs International Society for Krishna Consciousness, Inc. (ISKCON), a religious organization, and Joseph Beca, a member of ISKCON, challenge on this appeal the trial court's refusal to declare Minnesota State Fair Rule 6.05 uncontitutional and enjoin permanently the rule's enforcement. We conclude that enforcement of Rule 6.05 against members of ISKCON would violate their constitutionally guaranteed right to free exercise of religion.

Plaintiff ISKCON maintains temples and schools throughout the world and is organized under the laws of this state as a non-profit religious corporation. Members of ISKCON espouse the doctrines of Krishna Consciousness, a branch of the Hindu religion. Krishna Consciousness requires its followers to perform an evangelical ritual known as Sankirtan. The performance of Sankirtan consists of going out into public places to distribute or sell religious literature and to solicit donations for the support of Krishna Consciousness. The declared purposes of Sankirtan are to spread the doctrines of Krishna Consciousness, to attract new members to ISKCON, and to gain financial support for ISKCON's religious and educational activities.[1]

Plaintiff Joseph Beca is an ISKCON priest and the head of ISKCON's Minneapolis temple. Beca and other members of ISKCON wish to practice Sankirtan at the Minnesota state fair, an event which takes place from late August through early September of each year. Rule 6.05, as promulgated by the Minnesota state agricultural society (the society), a governmental body which has control of the state fairgrounds and responsibility for administration of the state fair, prohibits the sale or distribution on the fairgrounds of "any merchandise including printed or written material except under a license issued [by] the Society and/or from a duly licensed location."[2] The state fair's policy in applying Rule 6.05

1. This case is presented to us upon stipulated facts. The parties' stipulation provides in part: "In performing Sankirtan, ISKCON devotees often greet members of the public by giving them flowers or small American flags, but for the purpose of this lawsuit they seek only to solicit contributions for their literature and their religious activities, and not for these greeting gifts. They do not seek to dance, chant, or to engage in any other potentially disruptive or disorderly conduct."

2. Minn. Stat. § 37.16 (1978) authorizes the society to make "all bylaws, ordinances, and rules, not inconsistent with law, which it may deem necessary or proper for the government of the fairgrounds and all fairs to be held thereon, and for the protection, health, safety, and comfort of the public thereon" and provides that "[t]he

violation of a bylaw, rule, or ordinance promulgated by the society is a misdemeanor."

The president and secretary of the society are authorized to appoint "special constables or deputies * * * for the regulation of the Minnesota state fairgrounds" who "shall have and exercise upon the [state fairgrounds] all the power and authority of peace officers and, in addition thereto, may, within these limits, without warrant, arrest any person found violating any law of the state, or any rule, regulation, bylaw, or ordinance of the society, and may summarily remove the persons and property of such offenders from the grounds and take them before any court of competent jurisdiction to be dealt with according to law." § 37.20.

has been to restrict all sales and distributions of materials at the fair to fixed locations on the fairgrounds. In most instances these fixed locations take the form of booths or buildings rented from the society by sellers and distributors. Plaintiff ISKCON has been notified that its members who practice Sankirtan at the fair must confine all distributions and sales of religious literature and solicitations of donations to a rented booth.

Members of ISKCON are unwilling to have their practice of Sankirtan so restricted. They wish to distribute and sell religious literature and solicit donations throughout the areas of the fairgrounds that are open to the public. In August 1977, plaintiffs, on behalf of themselves and all members of ISKCON, commenced this action under 42 U.S.C. § 1983 (1979) and Minn.Stat. § 555.01 (1978) for a judgment declaring that Rule 6.05 violates the First and Fourteenth Amendments of the United States Constitution. Plaintiffs also asked the trial court to enjoin defendant state officials[3] from enforcing Rule 6.05 against members of ISKCON who practice Sankirtan in public areas of the fairgrounds.

The trial court issued a temporary restraining order prohibiting defendants from preventing members of ISKCON from proselytizing, distributing religious literature, or soliciting donations for religious purposes in public areas of the fairgrounds during the 1977 state fair. The trial court, however, enjoined members of ISKCON from "selling or inducing others to purchase" religious literature or items at any location within the fairgrounds other than one rented for that purpose. The parties thereafter made cross-motions for summary judgment based upon stipulated facts. By an order dated August 18, 1978, the trial court granted defendant's motion for summary judgment and denied plaintiffs' motion.[4] This appeal ensued.

The question presented for our decision is whether it is constitutionally permissible for defendants to apply Rule 6.05 so as to require that members of ISKCON who practice Sankirtan at the state fair confine their distribution, sale, and solicitation activities to a rented booth. The First Amendment of the United States Constitution forbids the enactment of laws prohibiting the free exercise of religion.[5] The time, place, and manner of religious activity may, however, be subject to reasonable and nondiscriminatory regulation if necessary to

3. The board of managers of the society, the members of which are defendants in this action, is vested with the management and control of the affairs of the society. § 37.04, subd. 1. One of the society's duties is to hold an annual fair upon the fairgrounds. § 37.15.

Defendant Michael Heffron, as secretary of the board of managers of the society and manager of the state fair, has responsibility for supervising all activities at the state fair and for implementing and enforcing all state fair rules and regulations.

Defendant Harveydale Maruska, as president of the board of managers of the society, has responsibility along with defendant Heffron for appointing peace officers to enforce all state laws and all rules, regulations, bylaws, and ordinances of the society on the fairgrounds.

Defendant Warren Spannaus, the attorney general of the State of Minnesota, directs a member of his staff to prosecute those arrested at the fairgrounds for violations of state laws or of rules, regulations, bylaws, and ordinances of the society.

4. The trial court's order provides:

IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment is in all respects denied. Defendants' motion for summary judgment is in all respects granted.

IT IS FURTHER ORDERED that plaintiffs are prohibited from

1) Engaging in any distribution of materials (e. g., books, flowers, flags, incense, artifacts, etc.) throughout the fairgrounds, except from rented booth space;

2) Engaging in any sales or solicitation for monetary donations throughout the fairgrounds, except from rented booth space; However, plaintiffs are permitted to:

Roam throughout those areas of the fairgrounds generally open to the public for the purpose of discussing with others their religious beliefs.

5. "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S.Const. amend. I. "The Fourteenth Amendment has rendered the legislatures or the states as incompetent as Congress to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

further an important governmental interest. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed.2d 1213 (1940). Defendants concede that Sankirtan is a religious activity entitled to First Amendment protection.[6] They argue that Rule 6.05, as applied by them to members of ISKCON, does not offend the First Amendment because it is a permissible regulation of the place and manner of the practice of Sankirtan.

■ Plaintiffs do not claim that Rule 6.05 has been applied to members of ISKCON in a discriminatory fashion. What is at issue here is the reasonableness of the rule as a place and manner regulation. The application to an individual of a governmental regulation which incidentally restricts him in the exercise of a First Amendment right is permissible only if the regulation "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *International Society for Krishna Consciousness, Inc. v. Conlisk*, 374 F.Supp. 1010, 1015 (N.D.Ill. 1973) (quoting *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)). The party urging that application of the regulation be upheld has the burden of proving that these criteria are met. *Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547

(1976). Defendants have not sustained that burden in this case.

Defendants assert that the state's interest in maintaining order at the state fair is sufficiently important to justify the application of Rule 6.05 to members of ISKCON. The state fairgrounds comprise approximately 125 acres. An average of 115,000 persons visit the fairgrounds each weekday while the state fair is in progress. On Saturdays and Sundays daily attendance averages 160,000. Approximately 1,400 exhibitors and concessionaires rented space at the 1977 and 1978 state fairs. We agree that these facts suggest a situation in which the state's interest in maintaining order is substantial. We have no doubt that Rule 6.05's requirement that all vendors, exhibitors, and concessionaires perform their functions at fixed locations furthers that interest significantly.

What defendants must demonstrate, however, is not the importance of the state's undeniable interest in preventing the widespread disorder that would surely exist if no regulation such as Rule 6.05 were in effect. Rather, they must establish the importance of the state's interest in avoiding whatever disorder is likely to result from granting members of ISKCON an exemption from compliance with the rule.[7]

■ It is fundamental that First Amendment rights may be restricted only for weighty reasons. We note that members of ISKCON are not prohibited from proselytizing throughout public areas of the fair-

---

6. Proselytism, the distribution or sale of religious literature, and the solicitation of donations by members of a religious organization *who seek to attract new members and to generate financial support for the organization* have long been considered activities protected by the First Amendment. *See Murdock v. Pennsylvania*, 319 U.S. 105, 110–11, 63 S.Ct. 870, 873–874, 87 L.Ed. 1292 (1943); *Cantwell v. Connecticut*, 310 U.S. at 305, 60 S.Ct. at § 904. For cases treating Sankirtan specifically as a bona fide religious practice, *see, e. g., International Society for Krishna Consciousness, Inc. v. Bowen*, 456 F.Supp. 437, 441–42 (S.D.Ind. 1978), *aff'd*, 600 F.2d 667 (7th Cir. 1979), and cases cited therein.

7. If Sankirtan is to be practiced properly, the various activities included in the practice of

Sankirtan must be performed in a peripatetic manner. Members of ISKCON therefore have a special claim to an exemption from Rule 6.05 *on free exercise grounds. Commercial vendors of literature can make no similar claim.*

Defendants argue that the facts as stipulated by the parties do not establish that Krishna Consciousness requires its followers to perform all of the activities comprising Sankirtan in a peripatetic manner. We recognize that in deciding this case we are limited by the parties' stipulation. We believe, however, that the peripatetic nature of Sankirtan is easily inferrable from the parties' explanation in their stipulation that the ritual is performed by "going out into public places."

grounds. Some disorder is bound to attend this activity. We are not convinced that allowing ISKCON members to also distribute religious literature and accept money throughout the public areas of the fairgrounds would cause additional disruption sufficient to justify confining those activities to a booth.[8]

■ Even if we assume the importance of the state's interest in preventing the disorder that will result from allowing members of ISKCON to distribute or sell religious literature and receive donations in public areas of the fairgrounds, we are not persuaded that application of Rule 6.05 to members of ISKCON is essential to the furtherance of that interest. The state's interest can be adequately served by means less restrictive of First Amendment rights. Conduct that tends to create disorder on the fairgrounds may be specifically prohibited.

[People may be prevented] from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. Such restraints on a solicitor's manner of conduct are characterized as after the fact prosecution, rather than a prior restraint on conduct. This type of sanction *after* the event assures consideration of the particular circumstances of the situation. Therefore, [a regulation should be aimed] at the *act* of obstruction itself rather than prohibiting solicitations on public sidewalks based on its desire to prevent obstruction and provide for the free flow of traffic.

Jones, "Solicitations—Charitable and Religious," 31 Baylor L.Rev. 53, 57 (1979). If the number of persons distributing and selling religious literature and receiving donations throughout the public areas of the fairgrounds becomes unmanageably large, a regulation to limit their number might be justified.[9] A place regulation less restrictive than Rule 6.05 might also be appropriate. For example, in *International Society for Krishna Consciousness, Inc. v. McAvey*, 450 F.Supp. 1265 (S.D.N.Y. 1978), the court refused to enjoin regulations establishing 10 areas at the World Trade Center in New York City within which only one ISKCON member at a time could solicit and prohibiting solicitations within 15 feet of certain designated places.[10]

8. During oral argument in October 1979, defendant suggested an additional interest as justification for applying Rule 6.05 to members of ISKCON: the state's interest in protecting the privacy of fairgoers. This interest is insufficient as long as Sankirtan is practiced in such a way that fairgoers who wish to avoid it are able to do so. The United States Supreme Court "has not generally allowed government to suppress speech [or, presumably, other activity protected by the First Amendment] solely to protect unwilling listeners from 'offensive' expression unless substantial privacy interests have been invaded. * * * The 'privacy' interests of unwilling listeners are strongest in the home * * *. In public places an individual's privacy interests in avoiding offensive communications are generally thought insubstantial unless the person is deemed a member of a 'captive audience,' either because the person is literally not free to leave without great burden * * * or because the person is in a place where one cannot readily avoid exposure to the unwanted communication." L. Tribe, *American Constitutional Law*, 677, 677–78 n. 13 (1978).

In *Farmer v. Moses*, 232 F.Supp. 154, 162 (S.D.N.Y. 1964), the court considered the privacy rights of visitors to the New York World's Fair and stated: "[T]hose of us who pay the regular admission fee and attend the Fair cannot be totally insulated from our fellows, nor can we expect to be shielded from expressions or ideas which are unanticipated and unsolicited. An individual's right of privacy is of practical necessity limited by the rights of others when he leaves his home and ventures forth into public areas, even those which he must pay to enter."

9. In connection with this we note that the parties have stipulated that "ISKCON, while unwilling to confine its religious activities to a booth, has indicated its willingness to submit to the regulation of its members in their circulation throughout the fairgrounds to proselytize, distribute, and sell literature, and solicit contributions."

10. The regulations upheld in *International Society for Krishna Consciousness, Inc. v. McAvey*, 450 F.Supp. 1265 (S.D.N.Y. 1978), are offered here only as an example. We do not intend to suggest that the same regulations would be appropriate at the Minnesota state fair. Regulations of the time, place, and manner of protected activity must be tailored to the forum in which such activity takes place. The state fair is not equivalent in character to the World

■ Although we are limited by the record in this case, we recognize that an additional concern of defendants may involve the manner in which some members of ISKCON are reputed to practice Sankirtan. Like the problem of maintaining order, this problem can be solved by means less restrictive than confining ISKCON members' distribution, sales, and solicitation activities to a booth. Persons claiming to be members of ISKCON may be required to establish their identity and authority to act on ISKCON's behalf before being permitted to practice Sankirtan throughout the fairgrounds. *Cantwell v. Connecticut*, 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed.2d 1213 (1940). Criminal and civil actions are available to remedy abuses such as fraud and battery in individual cases. *See International Society for Krishna Consciousness, Inc. v. Bowen*, 600 F.2d 667, 669–70 (7th Cir. 1979), *cert. den.*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

In *Bowen*, the United States Court of Appeals for the Seventh Circuit affirmed the district court's order enjoining Indiana state fair officials from enforcing against members of ISKCON a policy of prohibiting peripatetic solicitation on the fairgrounds. We share the cogent expression of the First Amendment principle stated in these closing remarks of the court of appeals' opinion (600 F.2d at 670–71):

> [W]e are not unmindful, as anyone cannot be who has travelled through a major airport facility in recent years, that practitioners of Sankirtan have been regarded as annoying and often downright irritating by those they approach. It is not, however, the cases in which the auditor is in agreement with that which is being expressed which reach the courts under the rubric of the First Amendment. Distaste for what is being expressed, and

often absolute revulsion, appear to be the hallmarks of the exercise of First Amendment rights and probably are the necessary contexts in which the preservation of those rights can be firmly assured.

The order of the trial court is reversed and remanded with directions that the trial court amend its order, in conformity with this opinion, to enjoin defendants from enforcing Rule 6.05 against members of ISKCON who wish to practice Sankirtan at the state fair.[11]

Reversed and remanded with directions.

TODD, Justice (dissenting in part).

I respectfully dissent in part from the majority opinion because, in my view, the portion of Minnesota State Fair Rule 6.05 which limits the sale of materials and collection of funds to a rented booth constitutes a reasonable time, place, and manner restriction which may constitutionally be applied to plaintiff International Society for Krishna Consciousness, Inc. (ISKCON).

The majority recognizes that religious activity may be subject to reasonable and nondiscriminatory time, place, and manner restrictions. In evaluating the validity of this type of restriction, a court must determine whether the regulation furthers a substantial governmental interest which has no relation to the content of the first amendment expression involved. Additionally, the restriction on the first amendment activity must be no greater than is necessary to further that governmental interest. *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). An application of this test requires the balancing of the competing interests involved and a consideration of the nature of the forum. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–303, 94 S.Ct. 2714, 2716,

Trade Center. Nor is it equivalent to an airport. *See, e. g., International Society for Krishna Consciousness, Inc. v. Eaves*, 601 F.2d 809 (5th Cir. 1979) (upholding a regulation requiring that the receipt of money by ISKCON members practicing Sankirtan at the Atlanta airport take place only at a booth).

11. Since this writing, an opinion has been published in which the Supreme Court of Colorado, in a case virtually identical on its facts to this case, reached the same result as we reach here. *See International Society for Kishna Consciousness, Inc. v. Colorado State Fair and Industrial Exposition Commission*, Colo., 610 P.2d 486 (1980).

41 L.Ed.2d 770 (1974), *Grayned v. Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). In his concurring opinion in the case of *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951), Mr. Justice Frankfurter summarized the four questions which have been considered by the United States Supreme Court in balancing competing governmental and first amendment interests. They are: (1) What is the interest deemed to require the regulation of speech (or other first amendment activity)? (2) What is the method used to achieve such ends as a consequence of which public speech is constrained or barred? (3) What mode of speech is regulated? and (4) Where does the speaking which is regulated take place? 340 U.S. at 282, 71 S.Ct. at 333; *see also Intern. Society for Krishna Consciousness v. Evans*, 440 F.Supp. 414 (S.D.Ohio 1977).

The restriction under consideration in this case, Rule 6.05, as applied, requires that the activities of distribution and sale of literature and the solicitation and accepting of donations be confined to a rented booth. The majority concludes that Rule 6.05, in its entirety, may not constitutionally be applied to the religious activities of members of ISKCON because a substantial governmental interest for the restriction has not been shown and/or because the governmental interests involved may be satisfied through less restrictive alternatives. However, in reaching this conclusion, the majority does not consider separately each activity which is restricted by the rule; namely, distribution, solicitation, sale, and collection of funds. Instead, the rule is analyzed as restricting a single form of activity. In my view, this constitutes an erroneous evaluation of the rule. Each activity which is sought to be regulated may serve a governmental interest to a greater or lesser degree and/or may serve a different governmental interest. Additionally, each component of the rule may have a different and/or greater or lesser impact on first amendment activity. Thus, in the balance, some of the restrictions may constitute reasonable time, place, and manner regulations while others may not.

I agree with the majority's conclusion that the portions of the rule which serve to restrict the activities of solicitation and distribution of religious literature may not validly be applied to the members of ISKCON. As was noted by the majority, Rule 6.05 does not seek to regulate proselytism by ISKCON members. There is no basis in the record for distinguishing the effect of proselytism from that of solicitation and distribution of religious literature on the claimed governmental interests involved herein. The state contends that the limitation of solicitation and distribution of literature to a rented booth serves a substantial state interest in maintaining public order and minimizing crowd confusion. However, it would appear that the acts of solicitation and distribution have no greater impact on the public order than does the act of proselytism. All three acts merely involve the communication of ideas. In fact, solicitation may be viewed as one form of proselytism. Solicitation is an act, the purpose of which is to obtain support for the religion involved except that the solicitor urges financial support rather than support for religious beliefs. The distribution of religious literature also constitutes a form of proselytism through the spreading of religious beliefs by means of written words rather than oral communications. The distribution of literature may have a lesser impact on order than oral proselytism because it may take less time. Additionally, since large amounts of literature are already collected by Fair patrons, the distribution of religious literature by ISKCON members does not have any great impact on any state concern for litter and the like. Thus, since the state expresses no substantial interest in regulating proselytism, it cannot validly claim to have any greater interest in regulating solicitation and distribution.

Therefore, these restrictions may not be justified as reasonable time, place, and manner restrictions since the acts of proselytism, solicitation, and distribution of religious literature are equally protected first amendment activities in this case. All three activities are religious activities which

are required of ISKCON members. In fact, as plaintiffs urged at oral argument, these activities constitute the most important and central aspects of the Sankirtan ritual.

However, a different conclusion is required with respect to the regulation of the sales activities and the collection of funds by members of ISKCON. Again, the state claims that the restriction of these activities to a booth serves a legitimate state interest in minimizing crowd confusion. The regulation serves this interest in a different way and to a greater extent than does the regulation of solicitation and distribution. Sales and collection activities engender additional confusion beyond that caused by solicitation and distribution because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc. *See Intern. Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809 (5th Cir. 1979). While these activities are not incompatible with other ongoing activities at the fairgrounds, they do serve to augment an already existing crowd control problem. The substantiality of the state's interest in this regard is obvious. The crowd at the fairgrounds is concentrated in about one third of the 125-acre fairgrounds. The average daily crowd is in excess of 150,000 people. Yet, the mere recitation of numbers from the stipulation does not portray the situation. Because of the large number of Fair patrons walking in the fairgrounds, there is confusion and congestion throughout the lanes of pedestrian traffic. Sales and collection can only serve to compound this problem. In determining that the state's interest in this regard is not substantial, the majority appears only to focus on the impact of ISKCON's activities on this problem. What the majority seems to forget is that its ruling today will allow for

others engaged in first amendment activity to be excepted from the "booth rule." As plaintiffs conceded at oral argument, they stand on equal footing with other religious and political groups entitled to first amendment protection. The effect of unrestricted sales and collection on the crowd control problem at the Minnesota State Fair may, thus, readily be seen.[1]

Specifically with respect to the activities of members of ISKCON, the restriction of its sales and collection activities to a booth also serves a substantial and legitimate state interest in protecting Fair patrons from fraud, misrepresentation, and other acts of misconduct. At the 1977 Minnesota State Fair, ISKCON members were permitted by court order to distribute materials and collect donations but were denied the right to sell items away from a booth. As a result of ISKCON activity at this Fair, the Fair Staff received 234 complaints, some of which indicated that ISKCON members violated the court order by selling items outside of a rental booth under the guise of collecting donations. These complaints also show that members of ISKCON misrepresented their identities and purposes when requesting funds[2] and also solicited minors. In support of its motion for summary judgment, the state submitted affidavits which verified this misconduct. By restricting the sales and collections activities of ISKCON members to a rented booth, the state's interest in protecting fairgoers from such acts of misconduct would be served because such a rule would require ISKCON members to clearly identify themselves and their purpose and would enable the state to adequately police their activities to ensure that the members are not engaged in such acts of misconduct.[3]

1. *See Intern. Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809 (5th Cir. 1979); *Edwards v. Maryland State Fair and Agricultural Society*, 476 F.Supp. 153 (D.Md.1979); *Hynes v. Metropolitan Government of Nashville and Davidson County*, 478 F.Supp. 9 (M.D.Tenn.1979); *Int'l. Soc., Krishna Con., Inc. v. McAvey*, 450 F.Supp. 1265 (S.D.N.Y.1978); *Inter. Soc. for Krishna Consciousness v. Evans*, 440 F.Supp. 414 (S.D.Ohio 1977).

2. The complaints indicated that ISKCON members stated to fairgoers that they were representing the Department of Natural Resources or the State Fair or were collecting funds for needy children or agricultural schools.

3. In footnote 8 of its opinion, the majority alludes to the claimed state interest in protecting the privacy of fairgoers and suggests that this interest is never relevant in the context of a state fair, citing *Farmer v. Moses*, 232 F.Supp.

The method of regulation in this case is impartial and nondiscriminatory. The rule is carefully drawn so that Fair officials can exercise no discretion when confining collection and sales activities to a booth. Fair officials cannot arbitrarily determine that some exhibitors are free to roam the fairgrounds while others are not. Nor is there any discretion given in the determination of who is entitled to rent booth space. Booths at the Fair are rented on a first-come, first-serve basis. Furthermore, the regulation is only minimally restrictive. It does not serve to prohibit any first amendment activity. The rule only limits that activity to a rented booth. Finally, the regulation of sales and collection only restricts noncommunicative aspects of any exhibitor's activity. It could not be more content neutral.

Thus, when the rule and the state's substantial interests in its enforcement are weighed against ISKCON's interests in this case, the reasonableness of the rule as a time, place, and manner regulation becomes apparent. Members of ISKCON have an undeniably protected interest in engaging in acts of sales and collection of funds since these are acts which are required as a part of the Sankirtan ritual. However, as plaintiffs stated at oral argument, these activities do not constitute the most central aspects of the ritual as do distribution of literature and proselytism. Thus, the regulation of sales and collection has a lesser impact on the religious activities of ISKCON members than would the regulation of distribution, proselytism, etc. Furthermore, the impact of the regulation on ISKCON's activities is not great since the regulation is merely restrictive rather than prohibitive. Contrary to the statement in the majority opinion, there is nothing in the record which establishes that ISKCON members are required to perform any and all aspects of the Sankirtan ritual in a peripatetic manner. Therefore, although the regulation of sales and collection has some impact on ISKCON's religious activities, the impact is not great when compared with the substantial state interests served by the rule.

The majority concludes that even if the state has a substantial interest in enforcing its rule against ISKCON members, these interests may be served through less restrictive alternatives and, thus, the rule may not be upheld as reasonable. The majority suggests that the state's interests may be served through prohibitions of specific acts of misconduct, limitations on the numbers of those selling materials and collecting funds throughout the fairgrounds, requirements concerning identification of ISKCON members, and through the bringing of civil and criminal actions for fraud and battery. However, in the context of the State Fair, these suggested alternatives could not viably be implemented and would only serve to increase the existing crowd control problems. All of the suggested alternatives would require Fair officials to police, in an individualized manner, specific acts of misconduct. The ability to police such activities is severely restricted if not made impossible because the fairgrounds is a large, overly-crowded area. Furthermore, the enforcing of a partial ban would entail the checking of credentials and other similar acts which would increase crowd confusion and congestion rather than ameliorate it. Additionally, all of the less restrictive alternatives would only serve to frustrate the legitimate state interest of promulgating a rule which is effective and easily enforceable. Thus, I cannot conclude that the restriction of sales and collection to a rented booth is anything less than a reasonable time, place, and manner regulation.

For the foregoing reasons, I would uphold Rule 6.05 to the extent that it restricts the sales of materials and the collection of funds to a rented booth.

154 (S.D.N.Y.1964). While I find that this claimed interest is not substantially served by the regulation of sales and collection in this case, I cannot agree that the privacy interests of fairgoers may never be balanced against the interests of those engaged in first amendment activities in determining the reasonableness of a time, place, and manner regulation. *See* *Hynes v. Metropolitan Government of Nashville and Davidson County*, 478 F.Supp. 9 (M.D. Tenn.1979); *Int'l. Soc., Krishna Con., Inc. v. McAvey*, 450 F.Supp. 1265 (S.D.N.Y.1978).

SHERAN, Chief Justice (dissenting).

I agree with Mr. Justice Todd.

SCOTT, Justice (dissenting).

I join in the dissent of Justice Todd.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.